FILED & ENTERED

SEP 29 2015

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Pgarcia    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

|  |  |
|---|---|
| In re:<br><br>MAHNAZ AALAM and MEHDY GHARACHEHDAGHY,<br><br>Debtors.<br>⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯<br>FARHAD SALEHSARI,<br><br>Plaintiff,<br><br>v.<br><br>MAHNAZ AALAM and MEHDY GHARACHEHDAGHY,<br><br>Defendants. | CHAPTER 7<br><br>Case No.:  1:09-bk-20792-VK<br>Adv. No.:  1:10-ap-01533-VK<br><br>**MEMORANDUM DECISION**<br><br>Date:        February 24, 2014<br>Time:        9:30 a.m.<br>Location:  Courtroom 301<br>              21041 Burbank Blvd.<br>              Woodland Hills, CA 91367 |

Farhad Salehsari ("Salehsari" or the "Plaintiff") is requesting a determination that, pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6), obligations of Mahnaz Aalam ("Aalam") and Mehdy Gharachehdaghy ("Gharachehdaghy" and together with Aalam, the "Defendants") to the Plaintiff are nondischargeable. The Court conducted the trial on February 24, 2014; the Plaintiff and the Defendants submitted trial briefs and post-trial briefs.  Having considered the declarations of Salehsari, Aalam and Gharachehdaghy

submitted for trial, the witnesses' testimony at trial, the remainder of the evidentiary record, the parties'

legal memoranda, and the arguments of counsel, the Court will enter a judgment in part for the

Defendants and in part for the Plaintiff, based upon the following findings of fact and conclusions of law

made pursuant to Fed. R. Civ. P. 52(a), as incorporated into Fed. R. Bankr. P. 7052.

## I.   STATEMENT OF FACTS

On August 20, 2009, the Defendants filed a chapter 7 petition.  On August 5, 2010, Salehsari filed

a motion to vacate the Defendants' discharge as to him only, because he did not receive proper notice of

the Defendants' bankruptcy petition.  On September 22, 2010, the Court entered an order granting that

motion.

On December 2, 2010, the Court entered an order granting Salehsari's motion for relief from the

automatic stay.  This order authorized Salehsari to liquidate nondischargeable claims against the

Defendants in state court.

On December 9, 2010, Salehsari initiated this adversary proceeding, alleging that the Defendants

had fraudulently induced Salehsari into making a $250,000 loan and that the Defendants had forged his

signature on applications for a contractor's license, a contractor's bond and the renewal of a contractor's

license.

### A.   *Salehsari's $250,000 Loan*

Salehsari and Gharachehdaghy became acquainted while both were working on several

construction projects: Salehsari as a construction superintendent/project manager and Gharachehdaghy as

a plastering subcontractor. [1]  Before making the $250,000 loan now at issue, Salehsari had loaned

approximately $30,000-$50,000 to Gharachehdaghy and $100,000 to a friend of Gharachehdaghy's.  Both

loans were unsecured, loosely documented (at best) and repaid without incident.  *See Closing Argument*,

filed by the Plaintiff on March 24, 2014 [doc. 109], ¶¶ 3, 4.

Either shortly before or after Salehsari made the $250,000 loan, he met Aalam at a party at the

Defendants' home.  *Declaration of Mahnaz Aalam ("Aalam Dec.")* ¶ 4; *Declaration of Farhad Salehsari

("Salehsari Dec.")* ¶ 1.  Although Salehsari contends that "the Defendants" made various promises and

---

[1]  If no other citation is given, the facts set forth are from the parties' testimony at trial.

statements to him about the loan (*see, e.g., Salehsari Dec.* ¶¶ 1, 3, 6), on cross-examination, Salehsari

admitted that he discussed the loan only with Gharachehdaghy.

In June 2005, after meeting at the Defendants' home in Tarzana, Salehsari and Gharachehdaghy

played tennis together at a property located on Brewster Drive in Tarzana (the "Brewster Property").   The

Defendants had acquired the Brewster Property for approximately $1.8 million; Gharachehdaghy was

renovating the Brewster Property.  While at the Brewster Property, Gharachehdaghy and Salehsari agreed

that Salehsari would loan $250,000 (the "Loan") for the completion of a condominium construction

project located at 6939-6941 Greeley Street (the "Greeley Project").   6939 Greeley Street LLC ("6939

Greeley") owned the Greeley Project; the Defendants owned 6939 Greeley.

Regarding the terms of the Loan, Salehsari represented that: (1) Gharachehdaghy asked him to

make the Loan; (2) the Loan was to be repaid in one year with interest (Salehsari never testified to the

specific interest rate that he anticipated ); (3) Aalam would be the borrower; and (4) Gharachehdaghy

promised that the Loan proceeds would be held as reserves, in a "safe and secure bank account which was

to remain untouched." *Salehsari Dec.* ¶¶ 2, 5.   In contrast, Gharachehdaghy testified that: (1) Salehsari

was eager to provide loans for real property projects and first raised the possibility of doing so; (2)

Salehsari demanded 20% interest, to which Gharachehdaghy agreed; (3) the Loan was to be made to 6939

Greeley; and (4) Gharachehdaghy never promised to hold the Loan proceeds untouched in a bank

account.  *Declaration of Mehdy Gharachehdaghy ("Gharachehdaghy Dec.")* ¶¶ 4, 8, 11.

Salehsari stated that he decided to make the Loan because the Defendants appeared to be rich and

prosperous, *e.g.,* they had a beautiful home, and Gharachehdaghy had told Salehsari that he bought the

Brewster Property for all cash.  *Salehsari Dec.* ¶¶ 1, 3.  As a result, Salehsari believed that the Defendants

could easily repay the Loan.  *Id.* ¶ 3.  (The Brewster Property was, in fact, subject to a large mortgage,

and Gharachehdaghy denied ever telling Salehsari that he paid all cash to acquire the Brewster Property.

*Gharachehdaghy Dec.* ¶ 6.)

On June 20, 2005, Salehsari obtained a cashier's check for $250,000 payable to 6939 Greeley (the

"Cashier's Check"). *Plaintiff's Exhibit 1.*  According to Salehsari, although the parties agreed that Aalam

would borrow the money, while Salehsari was in line at the bank to obtain the Cashier's Check,

-3-

Gharachehdaghy called and said that the Defendants' lender wanted the check to be made out to 6939 Greeley. *Salehsari Dec.* ¶ *5.* Gharachehdaghy, on the other hand, testified that he and Salehsari had agreed from the outset that the Loan would be made to 6939 Greeley. *Gharachehdaghy Dec.* ¶ 11. In any event, Salehsari gave the Cashier's Check to Gharachehdaghy [*Salehsari Dec.* ¶ *5*], and it was deposited in 6939 Greeley's bank account [*Aalam Dec.* ¶ 5].

On June 21, 2005, the Plaintiff signed a typewritten "Loan Agreement and Promissory Note" between Salehsari, as lender, and 6939 Greeley, as borrower (the "Loan Agreement"). *Plaintiff's Exhibit 2.* The Loan Agreement originally had "6941 West Greeley, LLC" (which was not an existing legal entity) as borrower. Salehsari interlineated the Loan Agreement on the first page and the signature page to change the borrower to 6939 Greeley. (Gharachehdaghy testified that the inclusion of "6941 West Greeley, LLC" as the borrower in the Loan Agreement was a simple mistake.)

Aalam subsequently signed the Loan Agreement on behalf of 6939 Greeley. *Aalam Dec.* ¶ 5. Among other things, the Loan Agreement provided for a 20% interest rate and a lump sum repayment at the end of one year, *i.e.,* in June 2006. *Plaintiff's Exhibit 2.* The Loan Agreement also states that the payment of the loan shall be made "by sending a check or other negotiable instrument made payable to Farhad Salehsari at the address set forth in Section L., below." Although there is no Section L., the parties' addresses are set out in Section K. *Id.* at 3.

Salehsari maintains that Gharachehdaghy's attorney prepared the Loan Agreement, which did not embody all of the terms and promises that Salehsari had understood and on which he relied in making the Loan. According to Salehsari, other than changing the name of the borrower, he did not make further revisions to the Loan Agreement to reflect these terms because Gharachehdaghy had promised that his attorney would write a personal promissory note signed by the Defendants "guaranteeing the [Loan]." *Salehsari Dec.* ¶ 6. Salehsari also represented that, when Salehsari asked for the personal promissory note, Gharachehdaghy told him that Gharachehdaghy was having problems with his attorney and he would use another attorney to write the promissory note. *Id.* Notwithstanding these divergent terms, Salehsari allegedly signed the Loan Agreement because he believed that Aalam's signature on the Loan Agreement - on behalf of 6939 Greeley - meant that she owed the money and that Gharachehdaghy, as

her husband, would also be liable. *Id.*

Gharachehdaghy, on the other hand, maintained that the Loan Agreement was jointly prepared by Salehsari and Gharachehdaghy and embodies all understandings respecting the Loan. *Gharachehdaghy Dec.* ¶¶ 8, 11. Gharachehdaghy testified that he needed the Loan to complete the Greeley Project and he was willing to pay interest at 20%, *i.e.*, an amount substantially higher than the 6 ½ - 7% rate charged by his construction lender, because proceeds from the Loan could be used immediately to pay subcontractors and expedite the completion of their work; in contrast, Gharachehdaghy could draw on the construction loan only after certification of work done.

The Greeley Project was completed, and the condominiums were sold at an aggregate profit exceeding $200,000 (*Plaintiff's Exhibit 10*). However, the Loan was never repaid. The Defendants use the sale proceeds from the Greeley Project for a construction project in Glendale (the "Glendale Project").[2] To fund the Glendale Project, in 2006 and 2007, the Defendants also received more than $2 million from loans secured by (i) the Brewster Property, (ii) other properties owned by the Defendants, and (iii) the land for the Glendale Project. *Plaintiff's Exhibits 6, 8, 12B.* As a result of the faltering economy, the Glendale Project was eventually lost to foreclosure.

Gharachehdaghy testified that Salehsari agreed, in order to increase Salehsari's return on the Loan, that the Loan could be rolled over into the Glendale Project, and that Salehsari did not demand repayment until significantly after the Loan's original maturity date. According to Gharachehdaghy, Salehsari stated he did not need the Loan to be repaid when it matured, *i.e.*, from the Greeley Project's condominium sales. *See also Aalam Decl.* ¶ 11. Salehsari represented, on the other hand, that he did not authorize the use of proceeds from the Greeley Project for the Glendale Project and that, at some point after the Loan matured, Salehsari repeatedly called Gharachehdaghy to ask for repayment. According to the Defendants, by the time that Salehsari demanded repayment of the Loan, the real estate market had collapsed, and there were no longer funds available to repay the Loan. *Gharachehdaghy Dec.* ¶ 11; *Aalam Dec.* ¶ 11.

---

[2] *See also* Defendants' Statement of Financial Affairs [Bankruptcy Case Docket, doc. 13] (stating, under "Other transfers," that the Defendants used $650,000 in sale proceeds from the Greeley Project to invest in the Glendale Project).

### B. *M&A Construction Corp.'s Applications for a Contractor's License and Bond*

M&A Construction Corp. ("M&A"), a company owned and controlled by the Defendants, functioned as the general contractor for the Greeley Project. Aalam was designated as the President of M&A. However, based on her testimony and Gharachehdaghy's testimony at trial, it is evident that Gharachehdaghy, not Aalam, was actually responsible for operating M&A. Neither Aalam nor Gharachehdaghy held the requisite general contractor's license for M&A's operations: Gharachehdaghy's contractor's license had been suspended, and Aalam did not have the knowledge necessary to pass the exams required for a general contractor's license. Salehsari, on the other hand, had held a general contractor's license for a number of years.

In 2005, the following documents were completed and filed on behalf of M&A:

- Contractors License Bond Application dated October 11, 2005 (the "Bond Application"). *Plaintiff's Exhibit 13A.*

- Application for Original Contractor's License – Examination Waiver dated August 12, 2005 (the "License Application"). *Plaintiff's Exhibit 13B.*

Aalam signed each of these documents as the President of M&A. Salehsari's signature is on each of these documents as the RMO; on the License Application, he is identified as the "RMO/Corporate Officer" and Vice President. (A "RMO" is a responsible managing officer.) Both documents contain Salehsari's correct driver's license and social security numbers.

The Defendants contend that Salehsari signed these documents and that he did so to ensure that the Greeley Project would be completed. Salehsari represented that the Defendants forged his signatures. *Gharachehdaghy Dec. ¶¶ 13, 14; Aalam Dec. ¶ 13; Salehsari Dec. ¶ 13.*

Gharachehdaghy testified that: (1) M&A needed a licensed general contractor for M&A to complete the Greeley Project and other construction projects; (2) Salehsari agreed to be RMO for the Bond Application and the License Application; and (3) Gharachehdaghy gave the Bond Application to Salehsari to sign. Gharachehdaghy did not remember who filled out the License Application. Aalam represented that she did not know who prepared the Bond Application and the License Application, and

that she was not present when Salehsari signed them.

Both sides agree that, in August 2005, Aalam and Salehsari met each other to be fingerprinted for the License Application. According to Aalam, she and Salehsari took the executed License Application with them and were fingerprinted as part of the contractor's license application process. *Aalam Dec.* ¶¶ 5, 13. Salehsari testified that he provided his driver's license number and social security number to the Defendants and had his fingerprints taken in anticipation of possibly doing work for Gharachehdaghy, but he did not sign any documents as RMO of M&A.

As a result of his affiliation with M&A, Salehsari became a defendant in several lawsuits. In December 2006, Salehsari was served with a complaint (EC 043246). *Salehsari Dec.* ¶ 16. On January 28, 2007, Salehsari, Aalam (for herself and for Fernglen LLC), and M&A entered into a retainer agreement with the law firm of Moghaddami & Sadigh (the "Retainer Agreement") to represent them in civil case No. PC038550. *Plaintiff's Exhibit 21A.* In the Retainer Agreement, Aalam agreed to hold Salehsari harmless from any action or judgment arising out of and related to Salehsari's association with the project at 10160 Fern Glen Avenue (the "Fern Glen Project"). *Id.* at 4.

Attached to the Retainer Agreement is an acknowledgement (back-dated to 2005) by Aalam that Salehsari has never been a contractor or associated with the Fern Glen Project or any other construction site "in reference to Fernglen, LLC or M&A Construction" (the "Acknowledgement"). *Id.* at 5. Salehsari maintained that Aalam entered into the Retainer Agreement and the hold harmless as a result of Salehsari's threat to go to the FBI and report the Defendants' fraudulent use of his signature on the Bond Application and the License Application. *Salehsari Dec.* ¶ 16.

After the execution of the Retainer Agreement and the Acknowledgement, M&A filed a Renewal Application for a Contractor's License dated November 4, 2007 (the "Renewal Application"). *Plaintiff's Exhibit 13C; Salehsari Dec.* ¶ 13. Aalam signed the Renewal Application, under penalty of perjury, as the President of M&A. A signature of Salehsari as the "Qualifying Individual" was also on the Renewal Application. The Renewal Application states at the bottom: "FALSIFICATION OF ANY APPLICATION IS CAUSE FOR DISCIPLINARY ACTION." Salehsari represented that the Defendants forged his signature on the Renewal Application. *Salehsari Dec.* ¶ 13.

In early January 2008, Salehsari received a notice of cancellation of M&A's Contractor's License Bond from the Surety Company of the Pacific, as a result of a lawsuit brought against M&A (EC 046222).  *Plaintiff's Exhibits 14A, 14B.*  On January 28, 2008, Salehsari commenced a lawsuit in the Los Angeles County Superior Court against the Defendants, 6939 Greeley, M&A, Fernglen and 6941 West Greenley Street LLC, alleging breach of contract, fraud and several other causes of action (the "Superior Court Action"). *Plaintiff's Exhibit 22.*  Salehsari executed a Disassociation Request, dated March 12, 2008, disassociating himself from M&A. *Plaintiff's Exhibit 16.*

In September 2009, the Enforcement Division of the Contractors' State License Board for the State of California (the "State License Board") brought a formal accusation against M&A, Aalam (as CEO/Pres. of M&A) and Salehsari (as disassociated RMO of M&A) (the "Accusation"). Gharachehdaghy is not identified as a respondent in the Accusation.  *Plaintiff's Exhibit 18.*

The Accusation states that M&A's contractor's license expired on October 31, 2007, was renewed on January 14, 2008, and was suspended on February 3, 2008 for failure to maintain a contractor's bond.  The Accusation further states that M&A is subject to disciplinary action, including revocation of its contractor's license, under Cal. Bus. & Prof. Code § 498 and § 7112 because "it misrepresented material facts" in the License Application and the Renewal Application, in that M&A and its representatives, "including its CEO/Pres., Aalam," certified under penalty of perjury: (i) "that Salehsari had agreed to be a qualifier on the [License Application]" and (ii) "that Salehsari was [M&A's] RMO." *Id*., ¶¶ 15, 17.  The Accusation also states that, in March 2008, Salehsari told a State License Board employee that "he never completed or signed an application to be a RMO for [M&A]" and "had never seen or signed the [Renewal Application]."  *Id.* ¶ 17.

Aalam and M&A apparently did not answer the Accusation.  On February 8, 2010, the State Board issued a "Default Decision and Order" (the "Default Decision"). *Certified Copy of the Default Decision (Dkt. 105).*  The Default Decision incorporates the Accusation, finds that "the facts and allegations set forth in the Accusation are true," revokes M&A's contractor's license, and bars M&A from reapplying for a contractor's license for five years. *Id.*

Salehsari has not submitted evidence that he has been held liable for damages in any lawsuits as a result of his affiliation with M&A, as set forth in the Bond Application, the License Application and the Renewal Application.  However, he represented that he had to pay thousands of dollars in attorney's fees in defense of such lawsuits and to defend himself before the State License Board. *Salehsari Dec.* ¶¶ 13, 19.

## II.  LEGAL STANDARDS

### A.  *11 U.S.C. § 523(a)(2)(A)*

Pursuant to 11 U.S.C. § 523(a)(2)(A), a bankruptcy discharge does not discharge an individual debtor from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – false pretenses, a false representation, or actual fraud, other than a statement respecting a debtor's or an insider's financial condition."

To prevail on a § 523(a)(2)(A) claim, the Plaintiff must prove the following five elements by a preponderance of the evidence:

(1)  misrepresentation, fraudulent omission or deceptive conduct by the debtor;

(2)  knowledge of the falsity or deceptiveness of his statement or conduct;

(3)  an intent to deceive;

(4)  justifiable reliance by the creditor on the debtor's statement or conduct; and

(5)  damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

*Oney v. Weinberg (In re Weinberg)*, 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009) (quoting *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000)).

#### i.  *Misrepresentation*

A misrepresentation may be a misstatement of fact or a promise made with present intent not to perform.  "[A] promise made with a positive intent not to perform or without a present intent to perform satisfies § 523(a)(2)(A)." *In re Rubin*, 875 F.2d 755, 759 (9th Cir. 1989).

1

### ii. Knowledge of Falsity and Intent to Deceive

Because intent is difficult to prove through direct evidence, it "may be established by

circumstantial evidence, or by inferences drawn from a course of conduct. Therefore, in determining

whether the debtor had no intention to perform, a court may look to all the surrounding facts and

circumstances." *McCrary v. Barrack (In re Barrack),* 217 B.R. 598, 607 (B.A.P. 9th Cir. 1998)(citations

and internal quotations omitted); s*ee also Citibank v. Eashai* (*In re Eashai*, 87 F.3d 1082, 1087 (9th Cir.

1996)("a court may infer the existence of the debtor's intent not to pay if the facts and circumstances of a

particular case present a picture of deceptive conduct by the debtor"); *Gertsch v. Johnson & Johnson Fin.

Corp. (In re Gertsch)*, 237 B.R. 160, 167-68 (B.A.P. 9th Cir. 1999) ("intent to deceive can be inferred

from the totality of the circumstances, including reckless disregard for the truth").

### iii. Justifiable Reliance

To satisfy the reliance requirement of § 523(a)(2)(A), a plaintiff must show "justifiable" reliance,

not "reasonable" reliance. *Field v. Mans*, 516 U.S. 59, 74-75, 116 S.Ct. 437, 446, 133 L.Ed.2d 351

(1995). Justifiable reliance takes into account the "qualities and characteristics of the particular plaintiff,

and the circumstances of the particular case, rather than of the application of a community standard of

conduct to all cases." *Id.* at 71. Thus, a plaintiff does not have a duty to investigate. *Id.* at 70, 75 n.12.

However, "justifiable reliance does not exist where a creditor ignores red flags" that show up before

extending credit. *Mandalay Resort Group v. Miller (In re Miller)*, 310 B.R. 185, 198-99 (Bankr. C.D. Cal.

2004)(citing *Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1286 (9th Cir. 1996)); *see

also Japra v. Apte (In re Apte)*, 180 B.R. 223, 229 (B.A.P. 9th Cir. 1995).

### iv. Not Concerning the Debtor's Financial Condition

Section 523(a)(2)(A) refers to representations *other than* those respecting the debtor's financial

condition. 11 U.S.C. § 523(a)(2)(A); *see also In re Kirsh*, 973 F.2d 1454, 1457 (9th Cir. 1992); *Barnes v.

Belice (In re Belice)*, 461 B.R. 564, 574 (B.A.P. 9th Cir. 2011). For example, representations regarding

collateral, as opposed to the debtor's "overall financial condition," would fall within § 523(a)(2)(A).

*Kirsh*, 973 F.2d at 1456.

1    In *Kirsh*, the debtors inflated the value of real property that was to be used as collateral and

2    falsely represented that there was only one encumbrance on the property. *Id*. at 1456.  The Ninth Circuit

3    Court of Appeals noted that the statement "did not purport to set forth the debtors' net worth or overall

4    financial condition" and proceeded to evaluate whether the debt as issue was excepted from discharge

5    pursuant to § 523(a)(2)(A). *Id*., at 1457; *see also Belice*, 461 B.R. at 574 (holding that "statement[s]

6    respecting the debtor's . . . financial condition" are those "that purport to present a picture of the debtor's

7    overall financial health") (internal quotations omitted) (citing *In re Joelson*, 427 F.3d 700, 714 (10th Cir.

8    2005)("What is important is not the formality of the statement, but the information contained within it –

9    information as to the debtor's . . . overall net worth or overall income flow.")

10   **B.    *11 U.S.C. § 523(a)(6)***

11   11 U.S.C. § 523(a)(6) states that a discharge under 11 U.S.C. § 727 does not discharge an

12   individual debtor from any debt "for willful and malicious injury by the debtor to another entity or to the

13   property of another entity." As in any § 523(a) action, the plaintiff bears the burden of proof by a

14   preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d

15   755 (1991).

16

17                    ***i.    Willfulness***

18   Demonstrating willfulness requires a showing that defendant intended to cause the injury, *not*

19   merely the acts leading to the injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62, 118 S.Ct. 974, 977, 140

20   L.Ed.2d 90 (1998). Thus, debts "arising from recklessly or negligently inflicted injuries do not fall within

21   the compass of § 523(a)(6)." *Id.* at 64.  It suffices, however, if the debtor knew that harm to the creditor

22   was "substantially certain." *Carillo V. Su (In re Su)*, 290 F.3d 1140, 1145-46 (9th Cir. 2002); *Petralia v.*

23   *Jercich (In re Jercich)*, 238 F.3d 1202, 1208 (9th Cir. 2001) ("the willful injury requirement of §

24   523(a)(6) is met when it is shown either that debtor had subjective motive to inflict injury *or* that the

25   debtor believed that injury was substantially certain to occur as a result of his conduct").

26

27

28

### ii.    *Maliciousness*

Under § 523(a)(6), the injury must *also* be the result of maliciousness. *Su*, 290 F.3d at 1146.

Maliciousness requires (1) a wrongful act; (2) done intentionally; (3) which necessarily causes injury; (4)

without just cause or excuse. *Id.* at 1147. Maliciousness does not require "personal hatred, spite, or will-

will." *Murray v. Bammer (In re Bammer)*, 131 F.3d 788, 791 (9th Cir. 1997).

### iii.    *Conversion*

"Conversion is the wrongful exercise of dominion over the property of another. The elements of

a conversion under California law are the plaintiff's ownership or right to possession of the property at

the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights;

and damages." *Farmers Ins. Exchange v. Zerin*, 53 Cal.App.4th 445, 451-52 (Ct. App. 997). That act

could be applying the property to the converter's own use. *Id.* Money can be the subject of a conversion

action if it is a specific and identifiable sum. *Id.* "California cases permitting an action for conversion of

money typically involve those who have misappropriated, commingled, or misapplied specific funds held

for the benefit of others." *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*,

150 Cal.App.4th 384, 396 (Ct. App. 2007). On the other hand, "a mere contractual right of payment,

without more, does not entitle the obligee to the immediate possession necessary to establish a cause of

action for the tort of conversion." *In re Bailey*, 197 F.3d 997, 1000 (9th Cir. 1999) (citing to *Imperial

Valley Co. v. Globe Grain & Milling Co.*, 187 Cal. 352 (1921)).

Even if a plaintiff demonstrates conversion, "[u]nder California law, 'a conversion is not per se

always a willful and malicious injury to the property of another." *In re Peklar*, 260 F.3d 1035, 1037 (9th

Cir. 2001) (quoting *Larsen v. Beekmann*, 276 Cal.App.2d 185, 189 (Ct. App. 1969)). Consequently, if the

Defendants converted property of Salehsari, Salehsari must also prove that the Defendants did so

"willfully and maliciously."

#### iv.    Forgery

A number of courts have found forgery to warrant nondischargeability under § 523(a)(6). *See, e.g., European Am. Bank v. Lapes (In re Lapes),* 254 B.R. 501, 506 (Bankr. S.D. Fla. 2000) (forgery of documents used to obtain a loan); *Crestar Bank v. Green (In re Green),* 175 B.R. 609, 613 (Bankr. E.D. Va. 1994) (forged document releasing a lien on real property); *and In re Zagar*, 136 B.R. 156, 159 (Bankr. N.D. Ohio 1992) (forged letters of authorization). Some injury must arise out of that forgery. *See, e.g., Zedd v. Sandler*, 143 B.R. 67, 69 (Bankr. E.D. Va. 1992).

Making misrepresentations on a contractor's license application, including the renewal of a license application, and forging signatures for such applications can lead to severe negative repercussions under at least three California statutes. Cal. Bus. & Prof. Code § 498 provides:

> A board may revoke, suspend, or otherwise restrict a license on the ground that the licensee secured the license by fraud, deceit, or knowing misrepresentation of a material fact or by knowingly omitting to state a material fact.

Cal. Bus. & Prof. Code § 7112 provides:

> Omission or misrepresentation of a material fact by an applicant or a licensee in obtaining, or renewing a license, or in adding a classification to an existing license constitutes a cause for disciplinary action.

Cal. Bus. & Prof. Code § 7121 provides:

> A person…who has been a partner, officer, director, manager, or associate of any partnership, corporation, limited liability company, firm, or association whose application for a license has been denied for a reason other than failure to document sufficient satisfactory experience for a supplemental classification for an existing license, or whose license has been revoked, or whose license is under suspension, or who has failed to renew a license while it was under suspension, and while acting as a partner, officer, director, manager, or associate had knowledge of or participated in any of the prohibited acts for which the license was denied, suspended, or revoked, shall be prohibited from serving as an officer, director, associate, partner, manager, qualifying individual, or member of the personnel of record of a licensee, and the employment, election, or association of this type of person by a licensee in any capacity other than as a nonsupervising bona fide employee shall constitute grounds for disciplinary action.

### C.    *Collateral Estoppel*

State court judgments may be entitled to preclusive effect in § 523(a) proceedings, under principles of collateral estoppel. *See Grogan*, 498 U.S. at 285.  The law of the state in which the judgment was rendered determines the preclusive effect. *Diruzza v. County of Tehama*, 323 F.3d 1147, 1152 (9th

Cir. 2003)(quoting *Marrese v. Am. Acad. Of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 1331, 84 L.Ed.2d 274 (1985)).  Under California law, issue preclusion can be applied when: (1) the issue decided in the prior proceeding is identical to the issue sought to be relitigated in the subsequent proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the issue was necessarily decided in the prior proceeding; (4) a final judgment on the merits was issued in the prior proceeding; and (5) the party against whom issue preclusion is sought was a party to the prior proceeding. *Lucido v. Superior Court*, 51 Cal. 3d 335, 341, *cert. denied*, 500 U.S. 920, 111 S.Ct. 2021, 114 L.Ed.2d 107 (1991). "The party asserting collateral estoppel bears the burden of establishing these requirements." *Id.*

In California, "[i]t is settled that the doctrine of collateral estoppel or issue preclusion is applicable to final decisions of administrative agencies acting in a judicial or quasi-judicial capacity." *Murray v. Alaska Airlines, Inc.,* 50 Cal. 4th 860, 867 (Cal. 2010).

> [i]ndicia of [administrative] proceedings undertaken in a judicial capacity include a hearing before an impartial decision maker; testimony given under oath or affirmation; a party's ability to subpoena, call, examine, and cross-examine witnesses, to introduce documentary evidence, and to make oral and written argument; the taking of a record of the proceeding; and a written statement of reasons for the decision.

*Id*. at 867-68 (quoting *Pacific Lumber Co. v. State Water Resources Control Bd*., 37 Cal.4th 921, 944 (2006)).

A default judgment may be entitled to collateral estoppel effect in § 523(a) proceedings. *See Harmon v. Kobrin (In re Harmon),* 250 F.3d 1240, 1246 (9th Cir. 2001).  In addition to the requirements for collateral estoppel discussed above, the party asserting the collateral estoppel effect of a default judgment must provide evidence that (i) the defendants either were personally served with the complaint or had actual knowledge of the litigation; and (ii) the default judgment necessarily required the finding at issue. *See, e.g., Harmon,* 250 F.3d at 1247; *Cal-Micro, Inc. v. Cantrell (In re Cantrell),* 329 F.3d 1119, 1123-1124 (9th Cir. 2003).

The Bankruptcy Appellate Panel of the Ninth Circuit has emphasized that state law is often not identical to the willful and malicious standard under § 523(a)(6). *See, e.g. In re Plyam*, 530 B.R. 456 (B.A.P. 9th Cir. 2015).  Consequently, final judgments against a debtor based on state law may not conclusively determine nondischargeability of a debt under § 523(a)(6).

### III. ANALYSIS

**A.** _**The Plaintiff has not met his burden of proof under 11 U.S.C. § 523(a)(2)(A)**_

Salehsari asserts the following misrepresentations by the Defendants:

- Promising, but never intending, to repay the Loan, as evidenced by their writing a non-existent entity on the Loan Agreement, providing for a 20% interest rate in the Loan Agreement, and leaving out Section L. regarding repayment;

- Promising, but never intending, to issue a personal guaranty to Salehsari;

- Promising, but never intending, that Salehsari would be lending money to Aalam personally;

- Promising, but never intending, that the loan proceeds would be untouched in a safe and secure account; and

- Stating that the Defendants paid all cash for the Brewster Property. [3]

Salehsari has not demonstrated that _Aalam_ made these promises or statements. Before Salehsari made the Loan, he may have met Aalam only briefly at a party or parties at her home, when they did not discuss business. Any subsequent discussions between Aalam and Salehsari occurred after Salehsari made the Loan; consequently, when making the Loan, Salehsari could not have relied on discussions with Aalam. Thus, there is no evidence to support nondischargeability under § 523(a)(2)(A) against Aalam.

#### i.    Promises

Gharachehdaghy denied promising that the Defendants would deliver a personal guaranty, that Aalam would be the actual borrower of the Loan, or that the loan proceeds would be retained untouched in a bank account throughout the term of the Loan. Having considered the testimony of the Defendants and Salehsari, the Court finds Gharachehdaghy's recounting of the promises made with respect to the Loan to be more credible.

Gharachehdaghy's version is supported by the documentation. Both the Cashier's Check and the Loan Agreement identify 6939 Greeley as the borrower (in fact, Salehsari wrote-in 6939 Greeley as the

---

[3]  Because Salehsari does not allege that he relied on any misrepresentations set forth in the Bond Application, the License Application and/or the Renewal Application, the statements made regarding Salehsari's affiliation with M&A in those applications are not relevant to the § 523(a)(2)(A) analysis.

borrower in the Loan Agreement).  There is no mention of a guaranty or other personal liability by either of the Defendants.  Nor is there any documentation for Gharachehdaghy's alleged promise to hold the proceeds of the Loan as reserves in a bank account.  Salehsari corrected the Loan Agreement to change the borrower from 6941 West Greeley to 6939 Greeley, but made no other changes.  For example, although Salehsari has contended that he did not demand a 20% interest rate for the Loan, he did not interlineate the Loan Agreement to provide for a lesser rate.

Salehsari testified that he asked why the Loan Agreement referred to 6941 West Greeley as the borrower, when the Cashier's Check was made out to 6939 Greeley.  He did **not** ask "why is the borrower 6941 West Greeley when it should be Aalam?"  If he believed that Aalam was to be the borrower, Salehsari could have changed the identified borrower in the Loan Agreement to Aalam.

It is less credible that Salehsari would correct one error in the Loan Agreement (the identity of the borrower), but not the other errors he now alleges.  As Salehsari has testified, he believed that Aalam was personally liable because she signed the Loan Agreement, although she signed the Loan Agreement on behalf of 6939 Greeley.  *Salehsari Dec.* ¶ 6.  He thought the Loan would be repaid because the Defendants appeared to be rich and prosperous; they owned a beautiful home and were developing a beautiful property with a tennis court.  *Id.* ¶¶ 1, 3.  Based on his observations and beliefs, and Salehsari's prior loan history involving Gharachehdaghy, Salehsari did not rely on receiving a personal guaranty from the Defendants when he made the Loan.

Furthermore, it is not credible that Salehsari, a construction superintendant/project manager with years of experience, and who held a general contractor's license, would have believed that he could receive 20% interest (as set forth in the Loan Agreement), or even a 10% interest rate, on a large loan for a real estate project if the proceeds of that loan had to be maintained, "untouched," in a bank account.

The only uncontroverted promise is that 6939 Greeley would repay the Loan in one year.  Salehsari is essentially arguing that, although Gharachehdaghy was not contractually liable to repay the Loan, Gharachehdaghy promised that 6939 Greeley, an entity he effectively controlled, would repay the Loan.  Such a promise may be a misrepresentation under § 523(a)(2)(A) if Gharachehdaghy did not intend to have 6939 Greeley perform *at the time the promise was made*.

For evidence of Gharachehdaghy's intent, Salehsari relies on the facts that the Loan Agreement contained a 20% interest rate,[4] identified a non-existent entity as borrower and, despite the reference in Section D of the Loan Agreement, did not contain a Section L.  However, these provisions do not establish Gharachehdaghy's intent that 6939 Greeley (to which Salehsari made the Cashier's Check payable) would not repay the Loan within one year at the stated interest rate (or a lesser interest rate, if the parties had agreed to that).

As discussed above, Salehsari's manual correction of one provision in the Loan Agreement reduces the credibility of his assertion that other terms in the Loan Agreement, such as the interest rate, were incorrect.  While it is undisputed that the Loan Agreement originally designated a non-existent entity, 6941 West Greeley, LLC, as the borrower, the designation of 6941 West Greeley is more credibly an error than a conscious effort to avoid repayment, given that the Greeley Project was located at 6939-6941 Greeley Street. Finally, the absence of Section L does not appear to constitute a nefarious attempt to avoid loan repayment: as described in Section D, Section L was only to provide the address to which payment of the Loan should be sent, and that address is nonetheless set forth in Section K of the Loan Agreement.

### ii.    *Statement about the Brewster Property*

Salehsari has testified that Gharachehdaghy told him that the Defendants bought the Brewster Property with all cash; Gharachehdaghy denies making this statement.  Salehsari has not met his burden of proof that: (1) Gharachehdaghy made this statement; (2) that, even if he made such a statement, Gharachehdaghy made it with the intent to deceive Salehsari into making the Loan; or (3) that Salehsari actually relied on this statement when he made the Loan.  Consequently, it will not support a determination that Gharachehdaghy has a nondischargeable obligation under § 523(a)(2)(A) to repay the Loan.

---

[4] The Plaintiff contends that the 20% interest rate was an attempt by the Defendants to make the Loan usurious. Although the transaction falls within the purview of usury laws because Salehsari is not an exempted class, *see* Cal. Const. art. XV, § 1, the Defendants have disclaimed any such intent.  *Gharachehdaghy Dec.* ¶ 11*; Aalam Dec.* ¶ 10.

**B.** ***The Plaintiff has met his burden of proof under 11 U.S.C. § 523(a)(6) only with respect to the Renewal Application***

As set forth in the *Second Amended Adversarial Complaint to Determine Dischargeability of a Debt 11 U.S.C. § 523* [doc. 39], and the *Order re Presentation of Evidence for Court Trial . . . .* [doc. 53], the Plaintiff bases his § 523(a)(6) claim on the following issues:

- the Defendants' alleged conversion of the Loan proceeds for their own use; and

- the Defendants falsely identifying the Plaintiff as the RMO of M&A for the Bond Application, the License Application and/or the Renewal Application and/or forging the Plaintiff's signature on the Bond Application, the License Application and/or the Renewal Application.

The Plaintiff argues that the Defendants converted the proceeds of the Loan. Conversion may be shown where a specific amount of money held for the benefit of others was misappropriated, commingled, or misapplied.

However, the Plaintiff has not carried his burden of proof of establishing that the Defendants used the proceeds of the Loan to pay subcontractors on the Greeley Project, or to fund the Glendale Project, without the Plaintiff's consent. Given Salehsari's prior loans involving Gharachehdaghy, Salehsari's occupation as a construction superintendent, as well as his possession of a general contractor's license, it is credible that Salehsari would have orally agreed that the proceeds from the Greeley Project could be used to pay subcontractors on the Greeley Project. It also is credible that, in order to increase his return on the Loan, Salehsari would have orally agreed that the proceeds from the Greeley Project could be used in connection with the Glendale Project. If he anticipated prompt repayment of the Loan in June 2006, why would Salehsari have waited years after that (when the Defendants allegedly were not returning his phone calls) to enforce his right to repayment?

On the other hand, the Defendants' unauthorized identification of Salehsari as RMO, and forging his signature on the License Application, the Bond Application and/or the Renewal Application, may provide grounds for nondischargeability under § 523(a)(6).

With respect to "willful," identifying Salehsari as the RMO of M&A - against his will and without his knowledge - would be expected to injure him *if* M&A's projects went awry and resulted in liability or regulatory difficulties to the Plaintiff.  Did the Defendants know that harm to the Plaintiff was *substantially certain* to occur (as is required for a finding of willfulness)?  For the License Application and the Bond Application, each of which were completed and submitted in 2005, the Plaintiff has not established this.

However, if Salehsari's name was misappropriated for the Renewal Application, which was completed and submitted in late 2007, that was substantially certain to result in injury.  By late 2007, M&A was named in a number of lawsuits.  Misidentifying Salehsari as the ongoing RMO of M&A at that time was substantially certain to involve him in those lawsuits, as well as regulatory difficulties.

With respect to "malicious," misrepresenting that Salehsari was the ongoing RMO for M&A and the forgery of Salehsari's signature would be wrongful – violating, among other things, several provisions of the Cal. Bus. & Prof. Code.  Regarding the Renewal Application, submitted in late 2007 when M&A had become a defendant in litigation, the issue of "necessarily" causing injury to Salehsari would be met.  Finally, in late 2007, there could be no just cause or excuse for misrepresenting Salehsari's status as the ongoing RMO for M&A or forging Salehsari's signature knowingly without his consent.

If entitled to collateral estoppel effect, the Default Decision establishes that Aalam misrepresented material facts in renewing M&A's contractor's license by certifying that Salehsari would continue to be M&A's RMO. (It does not establish any facts as to Gharachehdaghy, who was not named as a respondent in the Accusation.)[5]  However, the Court must determine whether Aalam *and Gharachehdaghy* misidentified Salehsari as the ongoing RMO for M& A, *knowingly without his consent*, or forged Salehsari's signature.

---

[5] It is unclear whether Aalam was personally served with notice of the proceeding that led to the Default Decision, as required for a default judgment to have collateral estoppel effect.  For trial, the Plaintiff submitted the Accusation, with a signed proof of service, as Exhibit 18.  The parties agreed that, in order for the Accusation to be admitted, the Plaintiff would submit a certified copy of the Accusation.  *Stipulation re Exhibit List Submitted to Court on February 14, 2014* [doc. 104].  However, the Plaintiff submitted a certified copy of the Accusation which *excludes* the proof of service.  *Notice of Filing Certified Copies of Trial Exhibits 18 and 20* [doc. 105].  The non-certified proof of service for the Accusation, submitted before the trial, indicates that Aalam was served at her residence (at the address used in the Defendants' chapter 7 petition) by first class United States mail - this would be sufficient under California law. Cal. Code Civ. Proc. § 415.30.

Whether the Defendants misidentified the Plaintiff as the RMO of M&A knowingly without his consent and forged his signature on the Renewal Application comes down to a question of credibility. Salehsari testified that he did not agree to be the RMO for M&A at any time; Gharachehdaghy testified that Salehsari did. Aalam testified that she did not see Salehsari sign the License Application, although she did go with Salehsari when they were fingerprinted for the License Application. The Court concludes that the Plaintiff has credibly testified that he did not sign the Renewal Application or agree to be the RMO of M&A for the Renewal Application.

Federal Rule of Evidence 901(b)(3) gives the trier of fact the authority to determine the authenticity of signatures by comparing them to an authenticated specimen. Salehsari has acknowledged that he signed the Loan Agreement, the Disassociation Request and the Retainer Agreement. *Plaintiff's Exhibits 2, 16, 21*. The Court has compared these signatures with the alleged signature of Salehsari on the License Application, the Bond Application and the Renewal Application. The signature in the License Application closely matches Salehsari's signature on the Promissory Note, the Disassociation Request, and Retainer Agreement, and is clearly Salehsari's. On the other hand, it is clear to the Court that the signature on the Renewal Application is not Salehsari's.

Moreover, the timing and circumstances surrounding the Renewal Application make Salehsari's testimony more credible. It is not credible that Salehsari would have agreed to remain the RMO for M&A and would have signed the Renewal Application in November 2007, after he has been served as a defendant in at least one lawsuit because of his affiliation with M&A (for projects other than the Greeley Project), Salahsari and Aalam had signed the Retainer Agreement (including the Acknowledgement), and when Salehsari was a few months away from commencing his lawsuit against the Defendants. Furthermore, the Defendants' explanation for why Salehsari agreed to become RMO of M&A - to help ensure completion of the Greeley Project – was no longer applicable in late 2007. As Aalam was the other signatory to the Renewal Application, Gharachehdaghy effectively controlled M&A, and M&A was owned by the Defendants, the Court finds that Gharachehdaghy forged Salehsari's name to the Renewal Application, and Aalam falsely certified that Salehsari would continue to be the RMO of M&A, when each of them knew that Salehsari did not consent to doing so.

Thus, the Plaintiff has established nondischargeability under § 523(a)(6) with respect to the Renewal Application. This is the only document which the Plaintiff has shown by a preponderance of the evidence that the Defendants did submit, knowingly using and signing the Plaintiff's name without his consent. Further, this is the only incident where injury would "necessarily" result; the Defendants had to have known that injury to Salehsari was "substantially certain" from the Defendants' unauthorized use of his name and signature for the Renewal Application at that time.

Nondischargeability under § 523(a)(6) requires injury to the Plaintiff arising from the "willful and malicious" acts. The Plaintiff has asserted that he incurred substantial attorney's fees to defend himself in connection with litigation and regulatory proceedings involving M&A. *Salehsari Dec.* ¶¶ 13, 19. To date, the Plaintiff has not provided any documentation concerning the damages which he incurred, *e.g.*, invoices for attorney's fees. At trial, the parties confirmed that they intend to liquidate damages for any nondischargeable claims in the pending Superior Court Action. Consequently, in the Superior Court, the Plaintiff may prove up his injury arising from the Defendants' unauthorized use of his name and the forgery of his signature on the Renewal Application.

### IV. CONCLUSION

For the reasons stated above, pursuant to 11 U.S.C. § 523(a)(6), any injury resulting to the Plaintiff from the Defendants' unauthorized use of his name and the forgery of his signature on the Renewal Application will not be discharged.

The Court will issue a separate order that conforms to the foregoing decision.

###

Date: September 29, 2015

Victoria S. Kaufman
United States Bankruptcy Judge